EUGENE M. JOHNSON, et al. *vs.* MOSES PALMER, et als.

York.    Opinion July 7, 1919.

*Wills. Construction of same. · General rule to be applied in ascertaining the inten-*
*tion and meaning of a testator. General meaning. and scope of the term*
*"reversion." General rule in equity as to considering that ·*
*as done which ought to have been done.*

After devising certain real estate in trust for the benefit of his wife, if she should become, and while she remained, his widow, a testator further provided:

"And in the event of the death or intermarriage of my said wife the said (trustee) shall in trust convey to my two sons, N., Jr. and M. . . . . that part of my lands which constituted my said original homestead to have and to hold the same for and during their natural lives and the reversion of the last mentioned farm to be conveyed to the children of said N. and M. if they have any, otherwise to all my grandchildren . . . ."

The trust in favor of the widow attached. It terminated upon her marriage, at which said N. Jr. and M., and as well other children of the testator, were living. N., Jr. then had only one child. M. lived and died unmarried and childless. N. Jr's. child outlived him, and died intestate before M. died, herself survived by a husband and one child. When M. (survivor of the life tenants) died, other grandchildren of the testator were living. The trustee never made conveyance of the farm either by carving out life estates to N. Jr. and M., or by deeding the reversion.

Upon bill by said surviving husband and child, praying construction of the will, as against the insistence of certain defendants that, as they only of testator's grandchildren survived both life tenants, title to the reversion of the original homestead farm passed to them, it is,

*Held:*

That title to the reversion was to remain in the trustee dependent on an event certain to occur, perhaps on one that might. The testator clearly meant to postpone the vesting of the reversionary estate until his widow either died or married, and not longer. When the widow married, conveyance of the life estates forthwith should have been made. And, at that same time, the class entitled to the reversion should have been ascertained, and the reversion accordingly conveyed. As N. Jr's. daughter, of the first denominated class, then alone was in being, the reversion should have been delivered over to her. What ought to have been done is considered to have been done.

Bill in equity asking for the construction of the will of Nathan Palmer, late of Hollis, Maine, deceased. The cause was heard on bill, answer, replication and agreed statement of facts; and, it appearing to the Justice presiding that questions of law of sufficient importance were involved, by agreement of parties cause was reported to Law Court for hearing and decision.

Judgment in accordance with opinion.

Case stated in opinion.

*George F. Gould*, for plaintiffs.

*Woodman & Whitehouse*, for defendants.

SITTING: CORNISH, C. J., HANSON, PHILBROOK, MORRILL, DUNN, DEASY, JJ.

DUNN, J. In the year of 1863, Nathan Palmer, who lived at Hollis, in York County, made his will. Promptly after his death, about two years later, the Probate Court in that County took proof that the instrument was indeed his lawful act, and allowed it. This suit in equity recently was brought to obtain a construction of that portion of the seventh clause of the will which, as set forth herein, is italicized for distinguishment. The clause referred to reads:

"Seventh. I give and devise unto my said nephew Daniel Townsend, all the rest and residue of my real estate in said Hollis, being my former and original homestead, and the ''Haley Farm'' being the same farms before mentioned, together with all my cattle, stock and farming tools, necessary to stock and carry on said farms and all my other personal estate after payment of the sums and expenses herein before specified *to hold in trust, in the manner and for the purposes following, viz: that said Daniel Townsend shall carry on, lease or rent said farms, stocked with such cattle as he may deem necessary, to the best advantage, and of the proceeds thereof lay out so much as may be necessary and proper to keep said farms in good order and condition and to raise on said farms such stock as may be necessary and at sundry times and as may seem to him most advantageous, sell or exchange any cattle from or on said farms and of any gains or net income from said farms derived as aforesaid to pay over yearly to my wife, said Mary A. Palmer, so long as she shall remain my widow and unmarried, so much as she may require for the comfortable support and maintainance of herself, and of said minor children during their*

minority. . . . . . . *And in the event of the death or inter-marriage of my said wife the said Daniel Townsend shall in trust convey to my two sons Nathan Palmer, Jr. and Moses Palmer, or in case of the death of either without children, to the survivor of them that part of my lands which constituted my said original homestead to have and to hold the same for and during their natural lives and the reversion of the last mentioned farm to be conveyed to the children of said Nathan and Moses if they have any, otherwise to all my grandchildren. . . . .*"

Mr. Palmer twice was married. Surviving him there were, (a) his wife, Mary A. Palmer, who remained his widow for nine years, when she married again; (b) his aforesaid children, Nathan Jr. and Moses, only two sons of his first marriage; (c) three daughters born of the first, and a son and a daughter born of the second marriage. The children of the children of group *c* contend with great insistence that, as they only of the testator's grandchildren survived the life tenants, title to the revision of the "original homestead" farm passed by the will to them.

Nathan, Jr. and Moses Palmer both were living, (the former having only one child and the other being unmarried and childless), when their stepmother, the testator's widow, married. But the testamentary trustee, neither then nor to the time of his own death long subsequently, made conveyance of the original homestead farm, either by carving out life estates to Nathan and Moses or by deeding the reversion. Nathan, Jr. died in 1891, outlived by his said child, born about two months after the death of her grandfather, of the name of Fredonia. She lived until 1911. The plaintiffs respectively are husband and only heir, her surviving. Moses Palmer, who never married, has died since the cause was argued. In the circumstances, his death does not necessitate pause in the case. On petition of them who now are plaintiffs, on February 18, 1913, a trustee under the will was appointed, in succession to the dead trustee. This trustee purported to transfer the title to the reversion of the original homestead farm to the plaintiffs, on the ground that to it they were of right entitled, in the stead of their wife and mother, who had died before conveyance to her by the first trustee. Three years later, on petition in behalf of Moses, who was alleged to be the owner in possession of an estate therein subject to a contingent remainder or an executory devise, the York Probate Court assumed to appoint a trustee to sell and convey the fee of the farm (R. S., Chap. 78, Sec. 4) which that

trustee promptly undertook to do, for the consideration of $11,000.00. Plaintiffs afterward filed this bill as against the life tenant, the trustee appointed to sell and convey the farm, and the testator's living grandchildren, praying construction of the will.

The intent and meaning of a testator, as he defined and recorded it, must be spelled out by scanning the words of his will, and that from his point of view. Words are pictures represented by sounds. They are to be read in the light of the day of their delineation. The object of judicial interpretation, in a case like this, is to ascertain what the language used by a testator represented in his mind; what he understood it signified. It is not so much a question as to what the words mean as to what they mean as he purposely employed them. And this to the end that, if agreeable to legal canons, his will shall prevail and not fail.

A chief object of Nathan Palmer in making his will, as gleaned from a reading of that document, was to provide for the befitting livelihood of his wife, should she become and remain his widow. Her he gave, for life or widowhood, whichever first should come to an end, the furniture of the family homestead, the (live) stock of the homestead farm, together with that farm itself, and all the personal property he used thereon. Beyond this, in the mooted seventh clause of the will, he created a trust, nominating a nephew of his to perform it. The body of this trust comprised the rest of Mr. Palmer's real estate in Hollis; that is to say, two farms, called by him the original homestead and the Haley farms; and it included, too, cattle, stock, and farming tools to carry them on, and all his available personal estate. From the net income of the trust, yearly was to be paid to testator's widow, so much money as she might have required for her appropriate support, and that of her minor children. When she died, or in case she married, the trustee was instructed to convey the original homestead farm, in life estates to testator's sons, Nathan and Moses. And, continues the will, "the reversion of the last mentioned farm to be conveyed to the children of said Nathan and Moses, if they have any, otherwise to all my grandchildren."

Failure of the trustee to discharge duty has not essentially complicated the situation. Equity will regard and treat him in whose favor an act should have been performed as clothed with the same interest, and entitled to the same rights, as if the act actually had been performed. The underlying inquiry of the case is, when and to

whom ought the trustee to have conveyed the reversion? The term, "reversion" sometimes is loosely used in wills or deeds. The reversion is that estate which is left, when from the entire fee, a lesser particular estate in being is granted. *Stinson* v. *Rouse*, 52 Maine, 261. It is that present vested, alienable, inheritable and devisable residue of an estate remaining in a grantor or his successors, or in the successors of a testator, to be enjoyed in possession, from and after the happening of a particular event, at some future time. The word, as the testator applied it, in disposing of his original homestead farm, must be held to have related to the title which would have remained in the trustee after the latter, conformably to the terms of the will, had conveyed to the sons for life. Imperatively the trustee should have conveyed the reversion to the children of Nathan and Moses, "if they had any." A conveyance presupposes both a conveyable estate and a grantee. Not having vested the less estates in the testator's sons, the trustee was without reversion to convey. But his neglect of duty has not affected the rights of the parties. When ought he to have done that which he was bound to do? For the reason that it is operative from the death of its maker, a will is presumed to refer to a situation then existing; but this presumption yields when the will manifests the testator's intention differently. "In the event of the death or intermarriage of my said wife," to recur again to Mr. Palmer's will, my trustee "shall in trust convey" (obviously, in discharge of his trust he shall convey), to my sons, Nathan and Moses, . . . my original homestead farm . . . for and during their natural lives, and that of the survivor of them; and the reversion of that farm "to be conveyed to the children of Nathan and Moses, if they have any." Lack, in the clause, of words of present gift to the children of Nathan and Moses is highly significant. By the will the trustee took a fee simple estate in trust. Title to the reversion did not vest immediately on the death of the testator in an indicated class of grandchildren. They were to take through the medium of a power in trust. Vesting of the reversion was to remain contingent until the happening of a conclusion. *Deering* v. *Adams*, 37 Maine, 264; *Pierce* v. *Savage*, 45 Maine, 90. Absence of words of present gift tends strongly to show that the testator intended his bounty should not be bestowed; that the beneficiaries should not immediately be clothed with possession of the title; that it should remain in the trustee dependent on an event certain to occur; perhaps

on one that might. The latter came to pass. When the widow married, the persons answering the same description and sustaining the same relation to the devise, should have been ascertained. *Giddings* v. *Gillingham,* 108 Maine, 512; *Hale* v. *Hobson,* 167 Mass., 397. The intention of the testator is not shrouded in mystery. His speech is that of the past pronounced at a time future to his own death. It is the testator himself, speaking at the time of the marriage and saying to the trustee: "She who was my widow has become the wife of another; henceforth of my estate she shall have only the provision made for her in that case. By consequence, now convey the farm on which I at first lived, in life estates to my sons, Nathan and Moses; and, contemporaneously, transfer the reversion in that property to Nathan's daughter, she being the only child yet born to either of my said sons." We think, and decide, that the testator clearly meant to postpone the vesting of the reversionary estate,—the trustee intervening,—until his widow either died or married, and not longer. She married. Therefore, conveyance of the life estates forthwith should have been made. And, at that same time, the class entitled to the reversion should have been ascertained; the reversion accordingly conveyed; and that formality have marked the termination of the trust, so far as it concerned the original homestead farm. As Fredonia, of the first denominated class, then alone was in being, the whole reversion should have been delivered over to her. The present day rights of the plaintiffs, on the presented record, are the same as if those things had been done; and Fredonia, afterward grown to womanhood, had died intestate owning the property, it burdened with a life estate in Moses, which estate in him ceased to exist when he died.

The view that the testator fixed upon the incident either of the death or the marriage of his widow as the time when the trustee should have devested himself of title, readily finds convincing accentuation upon reading the complete will. In different dispositive clauses he gave legacies to his children. First, to Nathan, Martha, Ruth and Lavina, "to be paid . . . as soon after my decease as may be convenient." Next, to Moses, payable "after he shall become 21 years of age." Likewise to a daughter, Emma Frances. The home farm he devised to his wife for life, the reversion to his son, Franklin, and his daughter, Emma Frances, . . . . "their heirs and assigns forever." In the seventh paragraph is bequest to Franklin

and Emma when "they severally arrive at the age of twenty one years." Also there, following the provision relating to the disposal of the original homestead farm, and unseparated therefrom even by punctuation point, is explicit command to the trustee to convey the remainder of the trust, namely, the Haley farm, to Franklin "after he shall have become twenty one years of age." In the next, that of the residuum, "I give and bequeath all the rest and residue of my personal estate . . . . to my three sons . . . . to be paid to them severally in equal shares and proportions after the decease or intermarriage of my said wife as aforesaid." No one seriously can doubt the significance of the testator's words regarding the old home farm. Their persuasiveness is outstanding. Deep sentiment clusters about them. In substance, said he: "When I am gone, pay the income from my former homestead farm to my widow until she dies or marries. When she dies, or in case she marries, in either event, then convey the farm in life estates to Nathan and to Moses, only sons of my first marriage. And, at the same time, convey the reversion to the children of said Nathan and Moses, if any they have; the other farms eventually shall become the property of the children of my second marriage." True, his intention could have been worked out in more perfect detail. But frailties inhere in every work of man, and not infrequently it is easy, as one travels a pathway, which is reasonably fit as another blazed it, to suggest possible improvement therein. Nathan Palmer said, in effect, that the reversion of his original homestead farm should be conveyed to the children of his sons, Nathan and Moses, if any they had, living when his widow died or married. To hold that by his written speech he meant and intended that the particular reversion should be conveyed to one or the other of two classes of his grandchildren, as the same might have existence when the life tenancies were over, would import to his language a sense he never designed.

When the testator's widow married, the trustee should have conveyed the reversion to Fredonia F. Palmer, the child of Nathan Palmer, Jr. What ought to have been done is considered to have been done. *Bank* v. *Portland*, 82 Maine, 99-110; *Railway* v. *Pierce*, 88 Maine, 86-93; *Chalmers* v. *Littlefield*, 103 Maine, 271-281. The reversion then vested exclusively in her.

*Bill sustained with single bill of costs.*
*Decree in accordance with this opinion.*